**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| vs. | ) Criminal Action No. 11-00262-KD |
| | ) |
| **STANLEY MARSHALL WRIGHT,** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER**

This action is before the Court on defendant Stanley Marshall Wright's Motion for Judgment of Acquittal (doc. 430) and the response filed by the United States (doc. 440); and Wright's Alternative Motion for Dismissal or New Trial (doc. 431), the response filed by the United States (doc. 434), and Wright's reply (doc. 435). An evidentiary hearing was held on April 17, 2013 and the parties provided the Court with their supplemental memorandums on April 22, 2013 (docs. 443, 444). Upon consideration and for the reasons set forth herein, the motions are DENIED.

I. Background

Defendant Wright was the mayor of the City of Bayou La Batre. After Hurricane Katrina the City applied for and received grant funds from the Federal Emergency Management Agency (FEMA). The funds were meant to fund a pilot program, the Alabama Alternative Housing Pilot Program (AAHPP), which was created to provide permanent housing as opposed to temporary housing for persons displaced by the hurricane. As a term of the grant agreement, the City and its agents were required to comply with 44 C.F.R. § 13.36(b)(3) which in relevant part, states that "[n]o employee, officer or agent of the grantee or subgrantee shall participate in selection, or in the award or administration of a contract supported by Federal funds if a conflict of interest,

real or apparent, would be involved." The regulation further explains that a conflict of interest arises when an employee, officer or agent of the grantee [City of Bayou La Batre] or any member of that person's immediate family, "has a financial or other interest in the firm selected for award."

Wright was indicted along with Janey Galbraith, a grant writer for the City, and Wright's daughter Mary Wright for conspiracy to defraud the United States in the application of the FEMA grant funds in violation of 18 U.S.C. § 371 (Count One, doc. 180). Wright was also indicted with Mary Wright for intentional misapplication of FEMA grant funds related to the City's purchase of real property from Mary Wright in violation of 18 U.S.C. 666(a)(1)(A) and (2) (Count Two, doc. 180). In addition, Wright was indicted for retaliation against a witness in violation of 18 U.S.C. § 1513(e) (Count Seven) and for attempting to intimidate or threaten the witness in violation of 18 U.S.C. § 1512(b)(3) (Count Eight). Following a jury trial, Wright was convicted on all four counts.

II. Motion for judgment of acquittal

Rule 29 of the Federal Rules of Criminal Procedure states that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A "defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). The Rule also provides that "[i]f the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed" and that the "court must specify the reasons for that determination." Fed. R. Crim. P.

29(d)(1).

"A [Rule 29] motion for judgment of acquittal is a direct challenge to the sufficiency of the evidence presented against the defendant." *United States v. Aibejeris*, 28 F. 3d 97, 98 (11th Cir. 1994) (footnote omitted). When deciding a Rule 29 motion, the "district courts should apply the same standard as that used for reviewing a conviction for sufficiency of the evidence. The Court must view the evidence in the light most favorable to the government and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989) (internal citations omitted). The Court must draw "all reasonable inferences and credibility choices in the Government's favor." *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (citation omitted).

To sustain a conviction, the evidence need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt[.]" *United States v. Garcia*, 447 F.3d 1327, 1334 (11th Cir. 2006) (citation omitted). "The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury." *Id*. at 1334 (quoting *Sellers*, 871 F. 2d at 1021) (internal quotations and citations omitted). Therefore, a "conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." *United States v. Tate*, 586 F.3d 936, 944 (11th Cir. 2009) (quoting *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir.1999)); *United States v. Hernandez,* 433 F.3d 1328, 1335 (11th Cir. 2005) (The Court must construe the evidence in the light most favorable to the government and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (citation omitted).

Wright moves for judgment of acquittal as to Counts One and Two. As to Count One, he argues that the United States has not produced sufficient evidence from which the jury could reasonably find that there was a conspiratorial agreement between Wright and Mary Wright or Janey Galbraith to: 1) defraud the United States of its right to honesty in the performance of Wright's affairs with FEMA; 2) defraud the United States of approximately $27,000; and 3) intentionally misapply FEMA money that was under the City control. Wright argues that the evidence was insufficient to prove that he, Galbraith or Mary Wright acted knowingly and willfully and with the specific intent to the defraud.

"The elements of a conspiracy under 18 U.S.C. § 371, are (1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement.'" *United States v. McDaniel*, 2013 WL 104930, *2 (11th Cir. Jan. 8, 2013) (slip copy) (quoting *United States v. Hasson,* 333 F.3d 1264, 1270 (11th Cir. 2003)).

In a light most favorable to the United States, the evidence at trial showed, *inter alia*, the following: After Hurricane Katrina, the City of Bayou La Batre sought federal assistance for housing. Initially, the non-profit organization Volunteers of America was involved in helping the City obtain assistance. Ultimately, Wright successfully encouraged the City Council to discharge Volunteers of America as the City's grant writer and administrator on the AAHPP development. Thereafter, Janey Galbraith was hired to administer the grant for the AAHPP development.[1] As a result Galbraith obtained a financially lucrative contract with the City to administer the AAHPP grant. The relevancy of this evidence was to show that Galbraith had a

---

[1] Both Volunteers of America and Galbraith had administered other grant projects for the City.

4

motive to assist Wright in the alleged conspiracy to misapply $27,000 of the FEMA funds.

After receiving FEMA grant approval, the City purchased land and began the FEMA housing project. At some point, the Alabama Department of Transportation determined that a different traffic configuration for the entrance to the development was necessary.[2] After Wright learned that the City would need to buy his small parcel of land to expand the entrance to the AAHPP development, Wright deeded the property to his daughter Mary. Within a month Mary agreed to sell the property to the City of Bayou LaBatre for $27,000.[3] There was evidence that this price was inflated and not a reflection of the fair market value.

In order for the property to be purchased for the AAHPP project, the City Council was required to approve the purchase. Before a City Council meeting is held in Bayou La Batre, there is a Council work session and an agenda prepared. The work session usually occurs a few days before the City Council meeting.[4] However, when the purchase of Mary's property was to be considered, the City Council's work session was held immediately before the council meeting.[5] The City Clerk did not have time between the work session and the council meeting to post or publish the agenda. Also, the purchase of Mary Wright's parcel was not specifically identified on the City Council agenda prepared by Galbraith.[6]

---

[2] There was no evidence that Wright influenced or participated in this decision.

[3] The appraiser who arrived at this figure is deceased.

[4] The City Clerk testified that the City Council meetings are held on the second and fourth Thursday each month and that Council work sessions are generally held on the preceding Monday. She also testified that a preliminary agenda is prepared after the work session, posted at City Hall, and provided by email.

[5] Council Member Downey testified that in November 2007, because of holidays, only one council work session and one council meeting was held.

[6] The City Clerk testified that Galbraith prepared the items for the agenda that were
(Continued)

City Council members relied on Galbraith's guidance regarding administering the FEMA funds. At the meeting on November 15, 2007, Galbraith gave her approval to the City Council as to both the purchase from Mary and the price ($27,000) to be paid for the parcel. Thereafter the purchase of the parcel was approved by the City Council. The purchase was made with FEMA grant funds. Wright abstained from the actual vote to approve the purchase and disclosed at the City Council meeting that he had given the property to Mary.

Thereafter on November 26, 2007, Wright and his wife transferred to Mary approximately $25,000.[7] Mary used the transferred money to pay off a debt of a similar amount. Immediately after the City issued the check to Mary on December 13, 2007, Mary repaid Wright and his wife for the previous $25,000 transfer.

The United States argued that abstaining from the vote and disclosing the conflict was not sufficient compliance with the federal regulation. Rather, the United States correctly states that the regulation requires that Wright not participate at all in the awarding of FEMA money to purchase Mary's parcel. It was the United States' theory that Wright was the moving force behind the determined price and purchase of the property, and that he manipulated the Council meeting, with the help of Galbraith, to push through the purchase without public scrutiny. This theory of Wright's participation was supported entirely by the circumstantial evidence as described *supra*. Since "conspiracies are secretive by nature, the existence of an agreement and [Wright's] participation in the conspiracy, may be proven entirely from circumstantial evidence."

---

related to the FEMA grant or other grants and that Galbraith would present these items at the Council work session. After the Council reviewed and approved the items, they would instruct the City Clerk to add the items to the agenda for the City Council meeting.

[7] The transfer was documented by bank records. The evidence also showed that Wright's wife had previously transferred an additional $2300 to Mary.

*United States v. US Infrastructures, Inc.*, 576 F. 3d 1195, 1203 (11th Cir. 2009). Considering the evidence in a light most favorable to the United States, the Court finds that the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Stanley Wright and Galbraith knowingly and willfully participated in a conspiracy as alleged in Count One.[8]

As to Count Two, Wright argues that there is no proof that he misapplied federal funds because he did not participate in the application of the money. "Under 18 U.S.C. § 666, federal funds theft requires proof beyond a reasonable doubt that (1) the defendant was an agent of an organization; (2) the organization receives more than $10,000 from a federal grant program in one year; (3) the defendant embezzled, stole, obtained by fraud, or otherwise without authority knowingly converted or intentionally misapplied property valued at $5,000 or more that was under the organization's care, custody, or control." *United States v. Williams*, 527 F.3d 1235, 240 (11th Cir. 2008).

The evidence when viewed in the light most favorable to the United States, as outlined *supra*, was sufficient for reasonable jurors to find beyond a reasonable doubt that Wright was guilty of willfully and knowingly misapplying federal funds. Specifically, Wright was an agent of the City and the City received more than $10,000 from the FEMA grant program. Moreover, Wright did not have authority to participate in the application of the $27,000 for Mary's parcel of land, thus he misapplied the funds.

III. Alternative motion for new trial

Wright moves the Court to set aside the conviction as to all counts – Counts One, Two, Seven and Eight - and dismiss the indictment or in the alternative order a new trial. In sum,

---

[8] There was insufficient evidence to find that Mary Wright knowingly and willfully participated in the alleged conspiracy.

Wright argues that the United States adduced misleading evidence before the grand juries, withheld material and exculpatory information, argued misleading facts to the district court and failed to correct false and misleading evidence presented at trial. All of these allegations are based on information gained from documents hereinafter referred to as the "withheld documents".

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). Rule 33 contemplates "two grounds upon which a court may grant a motion for new trial: one based on newly discovered evidence. . . : and the other based on any other reason, typically the interest of justice[.]" *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006); Fed. R. Civ. P. 33(b)(1)&(2). The decision whether to grant or deny a motion for new trial, rests in the sound discretion of the trial court. *United States v. Champion*, 813 F.2d 1154, 1170 (11th Cir.1987). When addressing a "'motion for new trial based on the weight of the evidence, the [district] court need not view the evidence in the light most favorable to the verdict,' instead, 'may weigh the evidence and consider the credibility of the witnesses.'" *United States v. Martin*, 490 Fed.Appx. 255, 258-259 (11th Cir. 2012) (quoting *United States v. Martinez,* 763 F.2d 1297, 1313 (11th Cir. 1985)). However, a district court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Id*. at 259 (quoting *United States v. Martinez,* 763 F.2d at 1312-1313)). To warrant a new trial, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Martinez,* 763 F.2d at 1313; *United States v. Segurola*, 484 Fed. Appx. 349, 350 (11th Cir. 2012) (same).

In Count Seven, Stanley Wright is charged with retaliating against City of Bayou La

8

Batre Police Officer Darryl Wilson because Wilson provided information to the FBI regarding the purchase of Mary's property with FEMA grant money. In Count Eight, Stanley Wright is charged with intimidating or threatening Wilson with the intent of hindering or preventing Wilson's communications with the FBI. Specifically, the indictment charged that Wright retaliated against and intimidated Wilson by ordering that Wilson be removed from further work on any federal agency task force. At the time this occurred, Wilson was assigned to the Organized Crime Drug Enforcement Task Force (OCDETF) and specifically to the "Toxic" investigation. Both the retaliation charge and the intimidation charge alleged that removal from the task force deprived Wilson of the ability to earn overtime pay. The United States also advanced the theory that the actions Wright took toward Wilson were additional proof that Wright knew the sale of Mary's parcel of land to the City was unlawful.

In support of the charges, the United States presented, *inter alia*, the following evidence: In January 2011, Wilson provided the FBI with information concerning Wright's participation in selling a parcel of land to the City for the AAHPP development. In February 2011, DEA Special Agent in Charge Gregory Borland received a letter from Wright to the effect that Wilson would no longer participate in federal programs after February 28, 2011.[9] Thereafter, Wilson also received a letter from Wright wherein Wilson was informed that he could no longer participate in any federal investigations. After Wilson was removed from the task force, Wright expressed, on

---

[9] The United States also presented a letter from Borland to Wright acknowledging receipt and indicating that the DEA would respect the request. The letter also stated "Captain Wilson's only involvement in any DEA investigation of late was in preparation for trials with the United States Attorney's office." (Government's Exhibit 248).

At one point in the trial the United States objected to the admission of this letter based on authenticity and hearsay, but later reversed course and offered it for admission. The United States then attempted to refute Borland's status of Wilson's participation by arguing, from the testimony of Joe Wolfe, that Borland did not know what was going on in the investigation.

at least two occasions to others, his lack of appreciation of Wilson's cooperation with the FBI and indicated that he wanted Wilson fired. Wilson testified generally that he felt intimidated by Wright and that his removal from the "Toxic" investigation precluded him from obtaining overtime pay from OCDETF.

Wilson also testified to other instances of retaliation and intimidation by Wright. Just a few weeks after Wilson had provided information to the FBI, Wright ordered Wilson, who was on medical leave, to return a police vehicle, an Infiniti SUV. Wright then attempted to have Wilson arrested when Wilson did not immediately return the vehicle. Also, Wilson testified that after Wilson spoke with the FBI, Wright reassigned him to patrol duty (which was demeaning for a Captain) and assigned him the least desirable police car in the fleet.

After trial, Wright's defense counsel received an email from the now retired DEA Agent Borland wherein he provided a chain of emails, among the U.S. Attorney, two Assistant U.S. Attorneys, and DEA agents, that had not been disclosed to the defense prior to trial (doc. 431, p. 18-20). The emails indicate that the DEA may have decided to terminate Wilson's OCDETF overtime funding in November 2010, before Wright's letter of February 2011. The emails also indicate that the matter was "resolved" but did not indicate the resolution. In a follow-up letter, Borland told defense counsel that the DEA never "authorized" any additional funding for Wilson, which is true but requires further explanation (see footnote 11).[10]

After receipt of the emails from Borland, Wright filed a motion to compel the United

---

[10] The U.S. Attorney's office attack on Borland as a "disgraced and disgruntled" former agent was unnecessary and unsupported by the facts. A person is not "disgraced" simply because an allegation is made against him. The Court understands that mistakes are made in the heat of litigation and that emotions run high. However, the United States Attorney's Office is armed with the ability to potentially damage a person's reputation with the stroke of a pen. Such power should be used with great care.

States to turn over all relevant documents. The Court granted the motion in part, and additional documents were provided from the United States.

The additional withheld documents support the argument that as of December 31, 2010, the <u>investigative stage</u> of the "Toxic" case was complete. Specifically, both Gloria Bedwell, the primary prosecutor on the Toxic investigation, and Police Sergeant Joe Wolfe, who was the lead case agent, signed a DEA/OCDETF interim report on February 1, 2011, indicating that the "Toxic" investigation was in the "judicial" phase as opposed to the "active" phase. Also, AUSA Bedwell had nominated the "Toxic" case for case of the year for 2010. According to AUSA Bedwell's email, the nomination indicated that the investigative phase of the Toxic case was completed in 2010.

However, none of the withheld documents refute the fact that additional funds were "obligated" for overtime.[11] Moreover, the withheld documents do not refute that there was a potential for additional overtime for Wilson on the Toxic cases during the <u>adjudicative phase</u>. While the fiscal year 2011 funding for Wilson may have been at risk of termination in early November 2010, the email from DEA Special Agent in Charge Jimmy Fox to U.S. Attorney Kenyen Brown dated November 10, 2010 at 11:24 a.m. indicated that the matter had been "[t]aken care of" and that an additional $6,000 had been added to Wilson's account. The email also explained that "[i]f more funds are needed, please advise. As you know we can make OT increases, a total of three times, per TFO [task force officer]. A letter will go out today notifying

---

[11] The payment through OCDETF of overtime for the "Toxic" case involved a two-part process. First, the funds had to be "obligated" by OCDETF for the "Toxic" case. Then it was the responsibility of the regional office of the DEA to certify the overtime so that the payments could be "authorized".

11

TFO Wilson's department of the OT approval."[12] At some time in November 2010, an OCDETF agreement was sent to the City's Police Chief John Joyner from Supervisor Jason Capstraw indicating that $6,000 was "obligated" for the period from October 1, 2010 through September 30, 2011 (United States' Exhibit 0046A).[13]

Wright argues that the withheld documents contain exculpatory and impeachment evidence and were withheld in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763 (1972). Wright also argues that as a result he is entitled, at the least, to a new trial.

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–1197; *United States v. Delorme*, 481 Fed. Appx. 592, 593 (11th Cir. 2012). "The Supreme Court has since held that the duty to disclose extends to impeachment, as well as exculpatory, evidence and is applicable even to evidence that an accused has not requested." *United States v. McLaughlin,* 279 Fed. Appx. 856, 857 (11th Cir. 2008) (citing *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936 (1999)).

In general, if the motion for new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure is based on newly discovered evidence, "the defendant must show that: '(1)

---

[12] This email was provided to the Court for *in camera* review and then provided to Wright. The email does not show that a courtesy copy was sent to Borland.

[13] The Agreement between OCDETF and Bayou La Batre is stamped "OCDETF Received Nov. 29" and indicates that the Agreement extended from October 1, 2010 until September 30, 2011 (Government's Exhibit 0046A). The chart of Wilson's overtime payments shows that $6,000 was obligated for Fiscal Year 2011, no claim for overtime reimbursement was made, and in mid February 2011, the $6,000 was "de-obligated". (Government's Exhibit 0047).

the evidence was in fact discovered after trial; (2) the defendant exercised due care to discover the evidence; (3) the evidence was not merely cumulative or impeaching; (4) the evidence was material; and (5) the evidence was of such a nature that a new trial would probably produce a different result.'" *United States v. Perez,* 2013 WL 49720, *2 (11th Cir. Jan. 4, 2013) (slip copy) (quoting *United States v. Lee,* 68 F.3d 1267, 1273 (11th Cir. 1995)). However, the standard is slightly different where the movant has alleged a *Brady* violation. "In deciding if a new trial is warranted on account of a *Brady* violation, a defendant must show that: (1) the government possessed evidence favorable to him; (2) he did not possess the evidence and could not have discovered it with reasonable diligence; (3) the prosecution suppressed this evidence; and (4) had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceedings would have been different." *Delorme*, 481 Fed. Appx. at 593-594 (citing *United States v. Newton*, 44 F.3d 913, 918 (11th Cir.1995)); *United States v. Elso*, 364 Fed. Appx. 595, 598-599 (11th Cir. 2010) (same) (citing *United States v. Vallejo*, 297 F.3d 1154, 1163 (11th Cir.2002)).

The Court finds that the withheld evidence is favorable to Wright in that it provides support for his argument that Wilson's ability to earn overtime was not hampered by Wright, but by the DEA. Moreover, Wright did not possess the evidence nor could he have been able to discover the information with reasonable diligence as the information was exclusively in the United States' possession. Also, the Court finds that the prosecution failed to produce the evidence in violation of *Brady*. The remaining issue is whether there is a reasonable probability that the outcome of the proceedings would have been different had Wright had access to the withheld documents.

"A 'reasonable probability' is a probability sufficient to undermine confidence in the

outcome." *United States v. Allen*, 416 Fed.Appx. 875, 878 (11th Cir. 2011) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383 (1985)). "The question is not whether the defendant would more likely than not have received a different verdict with the [concealed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 878-879 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566 (1995)). "The defendant does not have to demonstrate by a preponderance that disclosure of the suppressed evidence would have resulted in an acquittal." *Id*. However,"[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Rodriguez,* 452 Fed. Appx. 883, 888 (11th Cir. 2012) (quoting *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400 (1976)).

Under the facts of this case, the Court does not find that there was a reasonable probability that the outcome of the trial would have been different had the jury been presented with the withheld evidence. In sum, this is because a careful review of the pertinent trial testimony indicates that there was substantial credible evidence to support the argument that overtime funding was available and that Wilson's assistance was needed to complete the adjudicative phase of the "Toxic" case, in spite of the fact that the "Toxic" investigative phase may have been complete. Also, the withheld evidence would have provided very little, if any, impeachment of the testimony of Wilson or Wolfe.

The United States presented substantial evidence that there was additional work forthcoming on the Toxic case to prepare for trial[14], that spin-off cases were possible, and that

---

[14] The trials were scheduled for December 2010. No trials were held because all of the defendants scheduled for trial plead guilty. However, as of February 2011, there were still
(Continued)

14

Wilson may have had future work on other ICE and OCDETF cases. Specifically, former lead case agent Wolfe testified that in February 2011, there were still fugitives in the Toxic case that had not been apprehended, and consequently debriefed, and that there were potential OCDETF spin-off investigations including one involving certain individuals in Mississippi (doc. 427, p. 9-12).[15] Also, Immigrations and Customs Enforcement Agent Toby Wilkerson testified that around November 2010, he spoke with Wilson about a possible investigation of drug dealers who were "taking large sums of money and putting bets overseas" and that he was to meet with Wilson about this investigation in three to four weeks. However, because Wilson was not allowed to work on federal investigations, Wilson was not available to work with Wilkerson on that OCDETF case (doc. 427, p. 50-51).

In addition, Wilson testified credibly about his expectation of potential spin-off cases and the need to locate and arrest the fugitive defendants, which could have earned him overtime pay (doc. 426, pp. 69-72). The only possible impeachment of Wilson based on the withheld evidence, was to Wilson's acquiescence that Operation Toxic was "still an active investigation" (doc. 426, p. 69). However, as explained by Wilson, it was clear that his understanding of an active investigation included spin-off cases and fugitive round-ups.

Based on this evidence, the Court finds that the confidence in the verdict is not undermined by the U.S. Attorney's failure to produce the "withheld documents."

---

sentencing hearings to be held and fugitive defendants.

[15] Wolfe also testified that in February 2011, he believed that they were preparing for trial on the Toxic cases (doc. 427, p.9). He later stated that he was not sure of the time frame when he learned that Wilson had been terminated from the task force, but that it was before he started getting ready for the trials (doc. 427, p. 12). While this statement could have been explored by the defense based on the actual date of the trial setting (December 2010), such challenge would not have been derived from the withheld documents.

"Under *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the government is obligated to turn over to the defense any material evidence that could be used to impeach government witnesses." *United States v. Montero*, 440 Fed.Appx. 833, 840, 2011 WL 4056738, *4 n.2 (11th Cir. 2011) (citing *United States v. Jordan,* 316 F.3d 1215, 1226 n. 16 (11th Cir.2003)). "In a specific application of the *Brady* rule, the defendant can establish a due process violation under *Giglio*, if he can show that (1) the prosecutor 'knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony,' and (2) there is a reasonable probability that the perjured testimony could have affected the judgment." *United States v. Elso,* 364 Fed.Appx. 595, 599 (11th Cir. 2010). "Under *Giglio* the government may not knowingly present testimony that is 'false or misleading' or otherwise 'make a false statement to the jury.'" *United States v. Segurola*, 484 Fed. Appx. 349, 350 (11th Cir. 2012) (quoting *Hammond v. Hall,* 586 F.3d 1289, 1306–07 (11th Cir. 2009)). "To prevail on a motion for a new trial claim based on a *Giglio* claim, the defendant 'must establish that the prosecutor "knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony," and that the falsehood was material.'" *United States v. Duran*, 486 Fed. Appx. 768, 770 (11th Cir. 2012) (citations omitted).

"For the purposes of a *Giglio* claim, 'the falsehood is deemed to be material if there is any reasonable likelihood that the false testimony *could* have affected the judgment of the jury.'" *Id.* "A defendant is 'entitled to a new trial if there is any reasonable likelihood that the false testimony [or statement] could have affected the judgment of the jury.'" *Segurola*, 484 Fed. Appx. at 350 (quoting *Smith v. Sec'y, Dep't of Corr.,* 572 F.3d 1327, 1333 (11th Cir.2009) (quotation marks omitted)).

The Court does not find that the prosecution knowingly used perjured testimony. As

explained *supra,* the withheld documents do not support that the testimony by Wilson or any other witness was intentionally false.

Moreover, the Court does not find that the prosecution knowingly presented misleading testimony. With the withheld documents, Wright would have been able to clarify that any additional "investigation" on the "Toxic" case would have been limited to trial preparation and a search for fugitives. However, the Court does not find that the prosecution's failure to recognize the relevancy of the withheld documents, and thus produce them in discovery, was based on any intent to mislead the Court, grand jury or jury. Rather, it appears to be based on the prosecution's failure to make any distinction between available overtime funds for Wilson to complete the Toxic "investigative" phase and available overtime funds for Wilson to assist in the "adjudicative" phase.[16] Having not made the distinction, the prosecution team did not recognize the potential significance of the "withheld documents" which indicate that the "investigative" phase of "Toxic" was essentially over in December 2010.

Accordingly, Wright's motion for acquittal (Doc. 430) and his motion for dismissal or new trial (Doc. 431) are DENIED.

**DONE and ORDERED** this the 30th day of April, 2013.

                                            s/ Kristi K. DuBose
                                            KRISTI K. DuBOSE
                                            UNITED STATES DISTRICT JUDGE

---

[16] It appears to be a matter of perspective. From the DEA's perspective, the investigative stage was be complete once the investigation resulted in the indictments. However, the U.S. Attorney's Office reasonably expected that investigative support would continue until all of the cases were closed on the Court's docket.